KAI-LING FU, Employee, Plaintiff v. UNC CHAPEL HILL, Employer, SELF INSURED (Key Risk Management Services Third Party Administrator), Defendant

No. COA07-654

(Filed 5 February 2008)

**Workers' Compensation— occupational disease—increased risk—significant causal factor**

The Industrial Commission did not err in a workers' compensation case by finding that plaintiff university lab researcher sustained a compensable occupational disease based on its determination that plaintiff's employment placed her at an increased risk for developing her symptoms and that a viral vaccine taken for her employment significantly contributed to her symptoms, because: (1) a doctor's testimony provided competent evidence to support the Commission's finding that plaintiff was placed at an increased risk over persons in the general population for her symptoms by virtue of her employment; and (2) although two doctors testified that they did not believe plaintiff's symptoms were related to the vaccine, the Commission, in its discretion, gave greater weight to the testimony of three other doctors who took the causation element out of the realm of conjecture and remote possibility.

Appeal by defendant-employer from Opinion and Award entered by the North Carolina Industrial Commission. Heard in the Court of Appeals 11 December 2007.

*Patterson Harkavy LLP, by Leto Copeley and Jessica E. Leaven, for plaintiff-appellee.*

*Attorney General Roy Cooper, by Assistant Attorney General Marc X. Sneed, for defendant-employer.*

WYNN, Judge.

Appellate courts reviewing Industrial Commission decisions are limited to reviewing whether any competent evidence supports the Commission's findings of fact and whether the findings of fact support the Commission's conclusions of law.[1] Here, the defendant argues the evidence does not support the findings that the plaintiff's employment placed her at an increased risk for developing her symptoms and that the vaccine taken for her employment significantly contributed to her symptoms. Because the record shows that the Commission's findings are supported by competent evidence, we affirm.

Defendant, the University of North Carolina Chapel Hill (UNC) invited Dr. Kai-Ling Fu to come to the United States from China to continue her research on the pathology of HIV infection in the Department of Microbiology and Immunology at UNC. As a condition of her employment in the lab, Dr. Fu was required to be vaccinated against the Venezuelan Equine Encephalitis (VEE)—the virus used to investigate the HIV virus. After undergoing numerous health tests, including VEE and HIV tests, Dr. Fu was cleared to receive a VEE vaccination.

On 16 December 2003, the United States Army Medical Research Institute of Infectious Disease ("Army Medical Institute") in Fort Detrick, Maryland vaccinated Dr. Fu using the live VEE virus. For six days following the first vaccination, Dr. Fu experienced side effects of fever, headache, nausea, muscle aches, and weakness. Dr. Ellen Boudreau, chief of the Army Medical Institute Special Immunizations Program, testified that approximately two-thirds of patients exposed to the live virus experience similar side effects. To satisfy the requirements of her employment, Dr. Fu was required to undergo a second inoculation, or booster shot, because an evaluation after the first vaccination showed that her level of antibodies was too low.

On 9 March 2004, Dr. Fu received a booster shot which consisted of killed or inactivated VEE virus. The following day, Dr. Fu began to

---

1. *Deese v. Champion Int'l Corp.*, 352 N.C. 109, 116, 530 S.E.2d 549, 553 (2000) (citing *Adams v. AVX Corp.*, 349 N.C. 676, 680-81, 509 S.E.2d 411, 413-14 (1998)).

experience side effects, including weakness, nausea, fever, headache, and shortness of breath. Dr. Boudreau testified that approximately 15-17% of patients who receive the killed or inactive vaccine experience side effects similar to Dr. Fu's, but usually the side effects are not as pronounced or prolonged, and breathlessness is very unusual.

When Dr. Fu's side effects failed to subside, she visited a number of different doctors and received various types of medical treatment. On 23 March 2004, Dr. Michael Harrigan diagnosed Dr. Fu with a viral upper respiratory tract infection. Dr. Fu was also examined by Dr. Robert Gwyther on three different occasions, and in June 20004, he proscribed an inhaled bronchodilator to treat her shortness of breath. On 16 June 2004, Dr. Brian Boehlecke examined Dr. Fu and suggested counseling because he thought that she experienced hyperventilation and anxiety as part of a psychological reaction to her fear that the vaccine caused her physical harm. Additionally, Dr. Remy Coeytaux and Dr. Wunian Chen treated Dr. Fu with acupuncture through 20 September 2004, and Dr. Coeytaux recommended that Dr. Fu stop working for a short period due to her fatigue.

After a period of rest and acupuncture treatment, Dr. Fu's health returned to normal and she was ready to go back to work in December 2004. However, her former position was not available because Dr. Fu was not allowed to return to work in the VEE lab. On 1 April 2005, Dr. Fu accepted a position as a Research Technician III in the Lineberger Comprehensive Cancer Center.

On 31 March 2004, Dr. Fu filed a report of an injury or occupational disease, claiming that an injury occurred on 10 March 2004.[2] After UNC filed a denial of her claims, Dr. Fu filed a request for a hearing, seeking compensation for time out of work and payment of medical expenses that occurred as a result of her required inoculation. The hearing took place before Deputy Commissioner J. Brad Donovan on 15 June 2005, and on 13 April 2006, he issued an Opinion and Award denying Dr. Fu's claim for benefits based on contracting an occupational disease. Dr. Fu appealed to the Full Commission and on 1 May 2006, the Full Commission issued an Opinion and Award reversing the decision of Deputy Commissioner Donovan. The Full Commission concluded that Dr. Fu suffered a compensable occupational disease on 9 March 2004 and was entitled to temporary total disability benefits at the rate of $623.48 for the period of 11 March 2004 to 31 March 2005.

---

2. We note that the record shows that Dr. Fu's injury actually occurred on 9 March 2004.

**FU.v. UNC CHAPEL HILL**

[188 N.C. App. 610 (2008)]

In reviewing the Commission's decision, we are constrained by the well-established limitations that "(1) the full Commission is the sole judge of the weight and credibility of the evidence, and (2) appellate courts reviewing Commission decisions are limited to reviewing whether any competent evidence supports the Commission's findings of fact and whether the findings of fact support the Commission's conclusions of law." *Deese v. Champion Int'l Corp.*, 352 N.C. 109, 116, 530 S.E.2d 549, 553 (2000) (citing *Adams v. AVX Corp.*, 349 N.C. 676, 680-81, 509 S.E.2d 411, 413-14 (1998)). Guided by those restrictions, we now consider UNC's argument that the Full Commission erred by concluding that Dr. Fu sustained a compensable occupational disease under our Worker's Compensation Act.

Section 97-53 of the Worker's Compensation Act lists specific medical conditions that are automatically deemed to be occupational diseases. N.C. Gen. Stat. § 97-53 (2005). If a disease is not specifically listed in section 97-53, it may still qualify under section 97-53(13), which defines occupational disease as "any disease, other than hearing loss . . ., which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment." *Id.* § 97-53(13).

Our Supreme Court has outlined a test to determine whether a disease is occupational under section 97-53(13):

> For a disease to be occupational under G.S. 97-53(13) it must be (1) characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be a causal connection between the disease and the claimant's employment.

*Rutledge v. Tultex Corp./Kings Yarn*, 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983) (quotation omitted). "In a worker's compensation claim, the employee has the burden of proving that his claim is compensable." *Holley v. ACTS, Inc.*, 357 N.C. 228, 231, 581 S.E.2d 750, 752 (2003) (quotation omitted).

UNC first argues the Commission erred by finding that Dr. Fu's employment placed her at a higher risk than the general public of developing her symptoms. We disagree.

Under the *Rutledge* test, "the first two elements are satisfied if, as a matter of fact, the employment exposed the worker to a greater risk of contracting the disease than the public generally." *Rutledge,* 308 N.C. at 93-94, 301 S.E.2d at 365.

In this case, Dr. Boudreau testified that the Army Medical Institute Special Immunizations Program clinic received a risk assessment from Dr. Fu's supervisor requesting that she be immunized against VEE "so that she would be able to work with the VEE replicon in her work at the University of North Carolina, Chapel Hill." Dr. Boudreau also stated that the VEE vaccine was approved by the FDA for research only, and 15 to 17 percent of the people who receive the booster shot of the killed VEE virus experience systemic side effects. Finally, when asked whether persons who take the VEE vaccine because of their employment are at an increased risk for having systemic side effects as opposed to the general public, Dr. Boudreau stated, "[t]hat's true like with any vaccine . . . ." Dr. Boudreau's testimony provides competent evidence to support the Commission's finding that Dr. Fu was placed at an increased risk over persons in the general population for her symptoms by virtue of her employment. Accordingly, we find no error.

UNC next argues that there is no competent evidence in the record to support the Commission's finding that Dr. Fu's ongoing symptoms were causally related to her employment. We disagree.

The third element of the *Rutledge* test is satisfied where the occupational exposure "significantly contributed to, or was a significant causal factor in, the disease's development." *Rutledge,* 308 N.C. at 101, 301 S.E.2d at 369-70. The standard required to establish a causal connection between a plaintiff's injuries and her employment is "a reasonable degree of medical certainty." *Faison v. Allen Canning Co.*, 163 N.C. App. 755, 759, 594 S.E.2d 446, 450 (2004). Our Supreme Court has held that where "expert opinion testimony is based merely upon speculation and conjecture, it is not sufficiently reliable to qualify as competent evidence on issues of medical causation." *Holley,* 357 N.C. at 232, 581 S.E.2d at 753. The evidence "must be such as to take the case out of the realm of conjecture and remote possibility." *Id.*

Here, UNC argues that Dr. Fu did not present any objective evidence that the immune response she experienced was related to her 9 March 2004 booster shot, as Dr. Fu's blood work and pulmonary function test results were normal and there was no evidence of

**FU v. UNC CHAPEL HILL**

[188 N.C. App. 610 (2008)]

contamination in the vaccine. UNC also argues that Dr. Chen and Dr. Coeytax could not say to a reasonable degree of medical certainty that Dr. Fu's symptoms were related to the booster shot.

The record shows that deposition testimony was given by five physicians in this case. When asked whether they had an opinion to a reasonable degree of medical certainty as to whether Dr. Fu's symptoms were related to the VEE vaccine, the doctors testified as follows. Dr. Boudreau stated, "It is totally out of the ordinary . . . so it is hard to me to attribute it to the vaccine." Dr. Boehlecke testified that he agreed with Dr. Boudreau's assessment that Dr. Fu's symptoms were not related to the VEE virus. Dr. Chen stated, "I don't think I can give you the medical answer . . . for the Western medical diagnosis. I only have—give an Eastern acupuncture diagnosis. . . . From that point, I say sure. Yes." Dr. Coeytaux answered, "I don't like using the term 'certain,' so I can't say certain, but . . . I would say that that is probably what happened. . . . I think it is more likely than not. I think it is probable that that is the case." Finally, when asked whether Dr. Fu's anxiety was a personal sensitivity, Dr. Gwyther responded, "I think she had some symptoms that were [] attributable to the virus, and she got worried about them."

Although Dr. Boudreau and Dr. Boehlecke did not believe Dr. Fu's symptoms were related to the vaccine, the Commission, in its discretion, gave greater weight to the testimony of Dr. Gwyther, Dr. Coeytaux, and Dr. Chen. Because the testimony of Dr. Gwyther, Dr. Coeytaux, and Dr. Chen took the causation element out of "the realm of conjecture and remote possibility," *Holley*, 357 N.C. at 232, 581 S.E.2d at 753, there is competent evidence supporting a causal connection between Dr. Fu's symptoms and her 9 March 2004 booster shot. Accordingly, the record contains competent evidence to support the Commission's findings of fact and in turn, the findings of fact support the conclusions of law.

Affirmed.

Judges BRYANT and ELMORE concur.